1   WO

6   IN THE UNITED STATES DISTRICT COURT

7   FOR THE DISTRICT OF ARIZONA

9   Stephanie Clark,                           )   No. CV 08-300-TUC-HCE
                                               )
10            Plaintiff,                        )   **ORDER**
                                               )
11  vs.                                        )
                                               )
12                                             )
    City of Tucson; et. Al.,,                  )
13                                             )
             Defendant.                        )
14                                             )
                                               )
15  _____  )

17          The Magistrate Judge has jurisdiction over this matter pursuant to the parties'

18  consent. *See* 28 U.S.C. § 636(c).

19          Pending before the Court are: (1) Plaintiff's Amended Motion for Partial Summary

20  Judgment (Doc. No. 91) (hereinafter "AMPSJ"); and (2) Defendants' Motion to Strike a

21  Portion of Plaintiff's Reply to Defendants' Response to Plaintiff's AMPSJ (Doc. No. 102).

22  For the following reasons, the Court denies Plaintiff's AMPSJ and grants Defendants'

23  Motion to Strike.

24  **I.      PLAINTIFF'S ALLEGATIONS**

25          Plaintiff has filed the instant action alleging: "breach of state and common law duties;

26  negligence; gross negligence, assault, assault & battery" (Count One); and "federal and state

27  civil rights violations" pursuant to 28 U.S.C. §1983 (Count Two).  (Complaint, p.13 (Doc.

28  No. 1)) (capitalization omitted).  Plaintiff's claims arise from an encounter she had with City

of Tucson Police Department (hereinafter "TPD") Officers Robbie E. Salcido and William J. Gallego, resulting in "serious and permanent injuries to her knee and leg."[1] (*Id.* at ¶ 13). Plaintiff alleges that Defendant Salcido, *inter alia,* used excessive force during the encounter "by violently kicking and striking the Plaintiff's body with his leg and violently and brutally causing her body to be hurled and thrown down into [sic] the ground...[with] excessive and improper force...." (*Id.*).

## II. PLAINTIFF'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff seeks a ruling "that a jury trial is not needed on...[the following] facts..." and that the following factual assertions be ruled and determined as true facts for the remainder of the case:

1) That Defendant Officer Salcido did not follow the Tucson Police Department's General Operating Procedures when he forced Plaintiff Stephanie Clark from a standing position to a lying position on the ground when while facing her he used his hands to push her off balance and then placed one of his legs behind her right leg causing her to trip and fall backwards onto the ground; and

2) That Defendant Officer Salcido's use of force on Plaintiff Stephanie Clark while facing her he used his hands to push her off balance and then placed one of his legs behind her right leg causing her to trip and fall backwards onto the ground caused Plaintiff Stephanie Clark to experience a tear to her anterior cruciate ligament in her right knee.

(Plaintiff's AMPSJ, pp. 1-2).

### A. Factual Background

#### 1. Introduction

The following is undisputed for purposes of Plaintiff's AMPSJ. On October 8, 2008, the date of Defendant Salcido's deposition, Defendant Salcido was 30 years old and had been

---

[1]Plaintiff alleges she sustained "painful bone fracture(s) and ligament tears and injury about her knee and upper leg, which will cause some permanent change and injury, and probably [sic] disability and occupational impairment. Plaintiff ...suffered a painful fracture of her leg and knee as a result of the beating from [Defendant Salcido]. Plaintiff...probably will be left with a chronic pain condition in the knee and leg which was fractured. Plaintiff...was required to have reconstruction surgery, with implantation of hardware into her leg, to repair the injuries caused by..." Defendant Salcido. (Complaint, ¶27)

working for TPD for four years.[2] (PSOF, Exh. 1 at pp. 4, 9). On the date of his deposition, Defendant Salcido was six feet tall and weighed 185 pounds. (*Id.* at p.58). Defendant Salcido testified at his deposition that although he did not remember his exact weight on April 27, 2007, the date of the events giving rise to this action, his "weight has stayed pretty consistent." (*Id.*). On April 27, 2007, when Defendant Salcido encountered Plaintiff, he was on duty, driving a marked patrol car and in uniform. (*Id.* at pp. 59, 61; PSOF, Exh. 3 at p.16).

On April 27, 2007, Plaintiff was 25 years old, was five feet six inches to five feet seven inches in height and weighed between 220-235 pounds. (Defendants' Statement of Facts (hereinafter "DSOF"), Exh. 8 at p.113; DSOF Exh. 10).

It is also undisputed that in 2004 Defendant Salcido attended the Southern Arizona Law Enforcement Training Center (hereinafter "SALETC") and received training in the use of force and various maneuvers and defense tactics regarding how to bring a subject down to the ground. (PSOF, ¶¶4, 7, 12 (*citing* PSOF, Exh. 1, pp.11, 28, 32; *see also* DSOF at ¶¶4-7, 12; PSOF, Exh. 2 at p. 116)). Defendant Salcido was taught a defensive tactic called "OCCS"[3] in which the officer manipulates a subject's hand and wrist to get the subject to comply. (PSOF, Exh. 1, at pp. 28-29). Prior to his encounter with Plaintiff, Defendant Salcido had successfully employed the OCCS tactic with other subjects. (*Id.* at p. 31). The

_____

[2]Plaintiff states in her Statement of Facts that Defendant Salcido "was employed by the Tucson Police Department...for five years." (Plaintiff's Amended Statement of Facts (Doc. No. 92)) (hereinafter "PSOF") at ¶2 (*citing* PSOF, Exh. 1 at p.9 (Defendant Salcido's October 8, 2008 deposition transcript))). Defendant Salcido testified at his deposition as follows:

Q.[Plaintiff's Counsel]:　And you're employed by Tucson Police Department. For how long?
A.[Defendant Salcido]:　Be five years in February.
(PSOF, Exh. 1 at p.9). Thus on April 27, 2007, the date of the incident giving rise to this action, Defendant Salcido had been a employed with TPD less than five years.

[3]Defendant Salcido testified that "OCCS" was an acronym and he did recall what it stood for. (PSOF, Exh. 1, pp. 28-29).

OCCS tactic can be used from in front of or behind a subject and can be used on a subject who has "a handcuff on." (*Id.* at pp. 29, 31).

It is also undisputed that TPD General Order 2043.1 provides:

**Use without Training Prohibited**
*Except in cases of extreme emergency in which there are no viable alternatives, no officer is permitted to use any empty hand control technique*, intermediate weapon or restraint device of any type, or firearm, without first being trained in the use of that technique, weapon or restraint device.

(PSOF, Exh. 9) (bold in original, italics added).

It is also undisputed that TPD General Order 2043.2 provides in pertinent part:

**Training Center, Training and Documentation**
Except where otherwise indicated in these *General Orders*, all training of officers on any empty hand control techniques, firearms, intermediate weapons or restraint devices shall be approved and/or performed by the Training Center.

(*Id.*) (bold and italics in original).

Additionally, TPD General Order 2010 provides, in pertinent part:

It is neither the policy of the Department, nor the intent of these General Orders, that officers unnecessarily or unreasonably endanger themselves or others. It is not possible for any written statement concerning an officer's use of force to cover all of the fact scenarios that may occur within an officer's tour of duty. Therefore, the use of force model discussed in *General Orders* is recognized, and is to be used, as a general guide to using force when necessary. Officers must understand that situations may occur in which the escalation and/or de-escalation of resistance or aggression is sudden. Consequently, an officer's response may appropriately occur anywhere along the force model, as long as the response is an objectively reasonable response to the actual, or reasonably perceived, threat being presented by the subject.

(DSOF, Exh. 1).

Defendant Salcido understands that TPD General Orders are "a book of set rules and procedures that we abide by as officers." (PSOF, Exh. 1 at p. 19; *see also* PSOF at ¶ 8, DSOF at 8).

### 2. The Encounter

The reason why Defendant Salcido came into contact with Plaintiff on April 27, 2007 is in dispute. While the events as to how the encounter initially occurred are not necessary to resolve the instant Motion, these events give context to the facts that the Court must consider. Defendant Salcido's version of events begins with his observation of a vehicle,

later determined to be driven by Plaintiff, being driven without its headlights on. (PSOF, Exh. 1 at p.59). Defendant Salcido saw the vehicle pull into a parking lot and park at an apartment complex located at 1525 South Woodland.[4] (*Id.* at pp. 59-60). He decided to "conduct a traffic stop on the vehicle." (*Id.* at p. 60). According to Defendant Salcido, he exited his "marked police unit. At that time I witnessed [Plaintiff] exiting her vehicle." (*Id.* at p. 61). As Defendant Salcido approached Plaintiff, Plaintiff, whose car door was still open, immediately said "What do you want?" (*Id.* at p. 63). Defendant Salcido informed Plaintiff that she had been driving without her headlights on and asked for her driver's license. (*Id.*). Plaintiff told him, "No, you can't stop me" and she shut her car door. (*Id.*) During that time, Defendant Salcido had smelled the odor of marijuana coming from inside Plaintiff's vehicle. (*Id.*). He asked again for her driver's license and stated he had smelled marijuana coming from her vehicle. (*Id.* at p. 64). Plaintiff "[s]tated no and began walking away from..." him toward the apartment complex. (*Id.*). Defendant Salcido then "grabbed her arm and informed her she was under arrest and...gave her verbal commands to put her hands behind her back." (*Id.*).

Plaintiff denies she was driving without her headlights on. (PSOF, Exh.4 at p. 49). Plaintiff testified at her deposition that she had already exited her vehicle and was walking toward the gate of the apartment complex when Defendant Salcido approached her and asked for her identification. (*Id.* at pp. 54-55; (*see also Id.* at p. 62 "he pulled up after I had gotten out of the car and was walking to the gate.")). Plaintiff also testified that she did not respond when Defendant Salcido asked for her identification. (*Id.* at pp. 54-55). Instead, she dialed her brother's number on her cell phone. (*Id.* at p. 55).

From both Defendant Salcido's and Plaintiff's accounts, it is undisputed that at some

---

[4]Defendant Salcido was familiar with the area and had previously made arrests there. (PSOF, Exh. 1 at p.59). He considered the area and, specifically, the apartments at 1525 South Woodland to be a "[h]igh crime rate area." (*Id.*). He cited "prostitution, drugs, gang members..." and one homicide "involving a very violent suspect" as the type of crime he associated with that apartment complex. (*Id.*).

point after Defendant Salcido and Plaintiff exited their vehicles, Plaintiff did not heed Defendant Salcido's request for identification and Plaintiff walked south toward the apartment complex. (PSOF ¶43; PSOF, Exh. 1 at pp.63-64; DSOF, ¶ 43; PSOF, Exh. 4 at pp.54-55) The parties also do not dispute the following facts. Plaintiff was walking away from Defendant Salcido and toward the apartment complex "very fast." (PSOF, ¶ 48; PSOF, Exh. 1 at p.69; DSOF, ¶48; *see also* PSOF, Exh. 1 at p.68 ("It was a brisk walk.")). Defendant Salcido then grabbed Plaintiff's left arm, informed her she was under arrest, and ordered her to put her hands behind her back. (PSOF, ¶45; PSOF, Exh. 1 at pp. 64, 70; DSOF, ¶ 45). When Defendant Salcido grabbed Plaintiff's arm, Plaintiff's back was to him. (PSOF, ¶50; PSOF, Exh. 1 at p.70; DSOF, ¶50). Plaintiff did not stop walking when Defendant Salcido grabbed her arm and instead she kept walking and "resisting... [p]ulling away, screaming, saying, 'F**k you. Leave me the f**k alone.'" (PSOF, ¶¶52, 54; PSOF Exh. 1 at pp. 70-71; DSOF, ¶¶52, 54).

Defendant Salcido testified that when he initially grabbed Plaintiff's left arm, he attempted to place her in the OCCS grip but that did not work because "[s]he pulled away very violently and continued to resist...." (PSOF, Exh. 1 at p.96); however, Plaintiff testified that although Defendant Salcido had a hold of her hand for 30 to 45 seconds, she did not feel Defendant Salcido apply pressure to her fingers, wrist, hand or arm. (PSOF, Exh. 4 at pp. 115-116). Plaintiff flailed her arms about. (PSOF, ¶55; PSOF Exh. 1 at pp. 71, 74; DSOF, ¶55). Plaintiff testified that she used physical strength to keep her right arm away from Defendant Salcido. (PSOF, Exh. 4 at p. 74). The parties agree that Plaintiff also "started calling out a male's name." (PSOF, ¶57 (*citing* PSOF, Exh. 1 at p.72); DSOF, ¶57). Defendant Salcido believed that Plaintiff was calling for people in the apartment complex.[5] (PSOF, Exh. 1 at p.72). Defendant Salcido kept hold of Plaintiff's left arm. (PSOF, ¶52; PSOF, Exh. 1 at p.70; DSOF ¶52). As he was giving verbal commands, Defendant Salcido

---

[5]Plaintiff testified at her deposition that her brother lived at the apartment complex and she had come to pick him up. (PSOF, Exh. 4 at pp. 52, 100-101).

got out his handcuffs. (PSOF, ¶53; PSOF, Exh. 1 at p.70; DSOF, ¶53). Defendant Salcido was able to place a handcuff on Plaintiff's left wrist but when he ordered her to give him her right arm, she refused, swore at him, and continued to pull away and resist his efforts to fully handcuff her. (PSOF, ¶59; PSOF, Exh. 1 at pp. 72-73; DSOF, ¶59; *see also* PSOF, Exh. 4, p. 66 (Plaintiff testified that she was not willing to give Defendant Salcido her right arm)). Defendant Salcido testified that Plaintiff then "began to yell into the apartment complex for reenforcements is what it sounded like to me." (PSOF, Exh. 1 at p.73). Plaintiff testified that she was "[s]aying help and screaming" and "calling for my brother." (PSOF, Exh. 4, p. 77)

Defendant Salcido recalled that at some point during this time, Plaintiff was pulling in the direction of a wall of the apartment complex and that she was facing toward the wall. (PSOF ¶60;PSOF, Exh. 1 at pp. 88-89; DSOF, ¶60) Defendant Salcido did not recall whether Plaintiff's body ever came into contact with the wall or whether she was ever pinned against the wall. (PSOF ¶61; PSOF Exh. 1 at p. 89; DSOF, ¶61). Plaintiff testified that Defendant Salcido held her "up against the wall..." for approximately 30 to 45 seconds. (PSOF, Exh. 4 at pp. 114-116; *see also Id.* at pp. 82-83 ("I was against the wall...I got pulled away from the wall...")). According to Plaintiff, her thighs, stomach, chest, and face were up against the wall. (*Id.* at pp. 114-115).

Defendant Salcido testified that Plaintiff continued to flail her arms, resist, pull away and call for reenforcements and that at some point she turned around to face him. (PSOF, Exh. 1 at p. 74). Plaintiff testified that she physically struggled against Defendant Salcido. (PSOF, Exh. 4 at p.81). Defendant Salcido testified that Plaintiff continued to call for reenforcements and he "off-balanced her from the front and she basically...fell to the ground." (PSOF, Exh. 1 at p. 74; *see also* PSOF, ¶65; DSOF, ¶65; PSOF, Exh. 1 at p.73 ("She began to yell into the apartment complex for reenforcements is what it sounded like to me....She was yelling for reinforcements.")). Defendant Salcido described the maneuver as follows: "I had her left wrist obviously, and she was facing me, so at that time I held onto the left wrist and just moved her shoulders and her body a 45-degree angle to off-balance her." (PSOF, Exh. 1 at p.75). Defendant Salcido testified that he "forced... [Plaintiff] to the ground

to place her in handcuffs since she was not complying with my verbal commands or my commands for her to place her hand behind her back and continued to resist me." (*Id.* at p.73). Defendant Salcido testified that he intended to take Plaintiff to the ground. (PSOF, Exh. 1 at p. 78).

Plaintiff testified that Defendant Salcido pulled her from the wall, counted to three, and kicked her in the right knee using his left leg. (PSOF, Exh. 4 at pp. 82-83; *see also Id.* at p.82 ("I was against the wall, I heard him counting when I got pulled away from the wall, and I just heard a pop.")). Plaintiff heard a pop, felt pain, and fell to the ground. (*Id.* at pp. 83-84). Plaintiff did not see Defendant Salcido kick her. (*Id.* at p.117).

Defendant Salcido denied counting to three during his entire encounter with Plaintiff. (DSOF, Exh. 1 at p. 91). Defendant Salcido denied kicking any part of Plaintiff's body with his feet. (*Id.* at pp. 97-98).

Plaintiff also testified that she called for someone to come from the apartments because she was outside alone with a police officer and she wanted other people to see what was going on. (*Id.* at p. 78).

When Defendant Salcido was asked at his deposition whether, after he off-balanced Plaintiff causing her to fall to the ground, he fell to the ground as well, he responded that he did not recall falling to the ground: "I wasn't in a vulnerable position. That's all I know. I was taking control." (PSOF, Exh. 1 at pp. 85-86).

Once Defendant Salcido had Plaintiff on the ground, Defendant Salcido placed his "body weight and...[his] knee on...[Plaintiff's] shoulder area..." and he was able to handcuff her hands behind her back. (Id. at pp. 86-87, 98). After subduing Plaintiff, Defendant Salcido called for backup assistance. (*Id.* at pp. 98-99).

Defendant Salcido testified that when Plaintiff was yelling for people, he believed she was yelling for reenforcements and this caused him to fear for his safety. (*Id.* at p. 91). He stated that the force he used

> was the minimal amount necessary to control the situation....At that time I had to control the situation as fast as I could because reenforcements were coming and I feared for my safety.

(PSOF, Exh. 1 at p.92; *see also Id.* at pp.94-95 ("she was screaming, yelling for...a male name to come....I feared for my safety because she was calling for reenforcements....")). Defendant Salcido further testified that he feared for his safety:

> Because I'm familiar with that complex. I know there are violent criminals living there. Not all of them, but there are. I know the area. I had worked it for...approximately three years....Dealing with one person who was not compliant with my commands and resisting arrest put me at a vulnerable situation for another person to come out and assault me or kill me.
>
> ***
>
> I'm familiar with the area. I'm familiar with people who have lived in that complex. I know it's a violent area. I know there are guns and weapons in that apartment complex.
>
> I know there are gang members. I know a lot of people in that area do not have respect for authority. I was already dealing with someone who did not have any respect for authority. I did not know whether or not the person she was calling would have any respect for authority.

(*Id.* at pp. 94-95). Although Defendant Salcido did not know who Plaintiff was calling for, it "did cross...[Defendant Salcido's] mind..." that the person might be a gang member or violent and this made him fear for his safety. (*Id.* at p. 96).

According to Defendant Salcido, Plaintiff's "reenforcements..." arrived when he had Plaintiff controlled on the ground, but he was uncertain whether Plaintiff had been handcuffed at that time. (*Id.* at p. 92). A man, whom Defendant Salcido later learned was Plaintiff's brother, "had an aggressive stance, was looking at [Defendant Salcido]..., and began walking in [his]...direction." (*Id.*). Plaintiff's brother was not running but he was walking at "faster than a normal pace." (Defendants' Supplemental Statement of Facts (Doc. No. 106) (hereinafter "DSSOF"), Exh. 2 at p.19). Defendant Salcido commanded Plaintiff's brother to stay back but "[h]e continued to step closer." (PSOF, Exh. 1 at p. 93). Defendant Salcido took out his pepper spray and advised Plaintiff's brother that if he came closer, Defendant Salcido would use the spray. (*Id.*). Plaintiff's brother heeded the command. (*Id.*).

Plaintiff testified that she saw her brother after Defendant Salcido sat her up from the ground. (PSOF, Exh. 4 at p. 90). She does not know when her brother arrived. (*Id.*).

Defendant Salcido also testified that several people came outside the complex whom he believed were residents. (PSOF, Exh. 1 at p. 98).

Defendant "Salcido testified that during the entire...encounter with [Plaintiff]...she

never tried to hit him, kick him, or strike at him in any way, with anything." (PSOF, ¶56 (*citing* PSOF, Exh. 1 at p.71); DSOF, ¶56).

Defendant Gallego arrived as backup[6] after Defendant Salcido was "already dealing with–with Ms. Clark," (DSOF, Exh. 7 at p. 16) in that Plaintiff was on the ground face down and Defendant Salcido was "kind of kne[eling] down...[h] was grabbing her arm and putting a handcuff on her." (DSSOF, Exh. 2 at p.17). "And at this time he was asking me to make contact with another male who was advancing towards him that he was telling to get back. (*Id.* at p.16). The man "was saying...'Oh, that's my sister. What's going on?'" (*Id.* at p. 20). Defendant Gallego told him, "'Hey, get back. We'll let you know what's happening right now.' And I guess it turned out to be her brother." (*Id.* at p.16). Defendant Gallego described Plaintiff's brother as "a husky guy...maybe 200 or more...pounds" and five-feet-seven or five-feet-eight in height. (*Id.* at p.18). Plaintiff's brother complied with Defendant Gallego's verbal command to "go back..." (*Id.* at p.20).

For the past 27 years, eye-witness Kim Carson has lived near the apartment complex where the altercation between Plaintiff and Defendant Salcido occurred. (PSOF, Exh. 3 at p. 5). On that night, she went outside because she heard a woman screaming from the direction of the apartments. (*Id.* at pp. 9-10). Ms. Carson, "decided to go out and investigate to see what it is....[O]ur neighborhood has incidences that happen in it." (*Id.* at p. 26). Ms. Carson saw a policeman, *i.e.,* Defendant Salcido, in uniform who "had a woman [*i.e.,*

---

[6]Defendants state that "Officer Gallego arrived as a result of Officer Salcido requesting a 1084-1018, which is a request for backup ASAP." (DSSOF, ¶ 141 (*citing* Exh. 2 at p.15)). Defendant Gallego's deposition is confusing on this point. Defendant Gallego testified that he did not remember Defendant Salcido's exact verbiage in calling for backup but he believed Defendant Salcido said "I just need a 1084." (DSSOF, Exh. 2 at p. 16; ("I heard him pull a traffic stop and he said he had a 1084, and that's when I rolled up on the–on the incident there.")). On the page cited by Defendants, Defendant Gallego testified that 1084 is a backup call "which is–I start my unit as a backup, or there's 1084-1018 which means I need someone ASAP." (*Id.* at p.15). Defendant Gallego's testimony is not clear as to the precise time Defendant Salcido called for backup. However, Defendant Gallego's testimony minimally supports the inference that Defendant Salcido called for backup upon first initiating the stop.

Plaintiff] up against the wall....He had one of her arms, and I believe it was her left arm, and he was trying to get her right arm.  He was trying to handcuff her, and she was screaming that she wanted her brother."  (*Id.* at p. 14).  According to Ms. Carson, Defendant Salcido used his body to hold Plaintiff against the wall "because she's fighting him the whole time and trying to get away from him."  (*Id.* at p. 15).    Ms. Carson could hear Defendant Salcido tell Plaintiff to stop struggling.  (*Id.* at p. 16).  She also heard Plaintiff screaming that she wanted her brother.  (*Id.*).  When Plaintiff was against the wall, "[h]er face was facing towards the crowd...."  (*Id.* at p. 29).  At some point,  Ms. Carson saw the two come away from the wall and continue to struggle out onto a graveled area.  (*Id.* at p.17).  Plaintiff appeared to outweigh Defendant Salcido.  (*Id.* at p. 18).  Ms. Carson saw Defendant Salcido was trying to place his right leg between Plaintiff's leg "[a]nd it was kind of controlled, but then they–they went over sideways." [7] (*Id.* at pp. 18; *see also Id.* at p. 35).  According to Ms. Carson, they fell to the ground at the same time but Defendant Salcido did not fall on top of Plaintiff.  (*Id.* at pp. 35-36).  "He fell next to her.  And if anything, she would have fallen on him."  (*Id.* at p.36).

Ms.  Carson  testified  that  Plaintiff  was  "extremely  agitated",   screaming "continuously" "the whole time" and "fighting..." with Defendant Salcido.  (*Id.* at pp. 19-21).

Ms. Carson also testified that

> [a]t some point, and I don't know when it was, people in the crowd, and I'm assume–there was a crowd of people standing on the sidewalk.  And a gentleman advanced forward, and I'm assuming it was her brother, but that's only an assumption.  And the police officer told him to get back, and the guy went back....There was no aggression from the–the crowd, but I think the police officer was fearful that there would be.

(*Id.* at pp. 18-19).

Officer Paul Patterson, who is employed by TPD as an arrest and control tactics

----

[7]To Ms. Carson, it appeared that Defendant Salcido was using a technique that she has used at her work as a teacher to restrain someone who is struggling: "You use your body as leverage.  And you use one of your legs between their legs.  And you use your hip and your thigh, and then you lift up.  And then you sit down, and they sit down with you."  (PSOF, Exh. 3 at pp. 17-18).

coordinator for SALETC and who trained Defendant Salcido at SALETC, testified that Defendant Salcido received training for takedown maneuvers. (PSOF, Exh. at pp. 4, 10-11, 19-22). Defendant Salcido was not taught a takedown maneuver that involved tripping the subject backwards. (*Id.* at p.115; *see also Id.* at p. 119 (explaining reasons why "we try not to–to utilize those stepping motions and tripping techniques to make a takedown function.")). When Officer Patterson was asked about the specific takedown maneuver Defendant Salcido employed with Plaintiff, Officer Patterson testified that the maneuver "[a]s a takedown, it is not taught." (*Id.* at p. 117). After hearing Defendant Salcido's description of the maneuver used with Plaintiff, Officer Patterson testified: "that's not something that specifically was trained in that order...There are components of everything that was in here that would fit directly with a manner in which he was trained." (*Id.* at pp. 127-128).

      Officer Patterson also testified:

> There's no way that myself as an instructor could spell out every possible set of circumstances that they're ever going to have to manage in the course of their tenure as an officer.
>     So, although we can give them some guidelines and some basic principles of what it is that they do and how that functions and we can give them some techniques that will assist in those functions, it would be impossible to say it would work every time under every condition under every set of circumstances.
>     So, to that, we kind of–we–we've even used it as the ATW acronym of anything that works. There comes a time when certain things happen in a confrontation and you may go outside the basic guidelines of what's written specifically on this piece of paper in order to successfully resolve the—the circumstances of that confrontation. And that is an accepted practice.
> ***
> Specifically what was said to Officer Salcido, I couldn't quote. I would venture to guess that it was very similar to what we do now. We still go under that principle that if you have to do something to get somebody under control, the big key is this: It has to be reasonable and it has to be based on the circumstances at the time of the event.

(*Id.* at pp. 30-32).

      Officer Patterson opined that, under the circumstances, Defendant Salcido did not violate General Order 2043.1:

> I don't believe that Officer Salcido takes a tactic and applies it in an inappropriate manner. His thought process is to perform a takedown. In the course of the takedown, resistance is occurring. It's a dynamic environment where a lot of variables are changing....My opinion is based on the level of resistance that Officer Salcido is encountering at this standpoint, which is an

individual is trying to get away from a detention and not exhibiting any behaviors to aggressively attack him, and his intention is to get this person to the ground in the form of a takedown, which is consistent with the manner in which he was trained....In a training environment, we can show him all the exact steps that say this, this, this, as it's spelled out in the manual. But in a real world environment, it won't be all of those things. It can only be a kind of–almost like a model that you can utilize, but you can't say it will work 100 percent of the time in every set of circumstances.

But the nature of his response of utilizing that takedown to overcome the resistance is appropriate. It's consistent with the manner in which he was trained and what he's attempting to accomplish, which is get this resisting subject on the ground and under control, especially in light of the other circumstances that he has coming into play.

(DSOF, Exh. 3, pp. 34-36). Officer Patterson based his opinion on the assumption, that Defendant Salcido placed his leg behind Plaintiff's leg with the intent of tripping her. (*Id.* at p. 36).

### 3. Causation

Plaintiff testified at her deposition that in 2003 or 2004 she injured her right knee and was told by medical providers at that time that she had torn ligaments. (PSOF, Exh. 4 at pp. 20-21). She used a brace and crutches for a week and "then after that I was fine." (*Id.* at p.22; *see also Id.* at p. 23 (after two weeks Plaintiff was able to return to full mobility)). She was also given pain medication. (*Id.* at p. 21). Plaintiff was in a car accident in 2003 and was uninjured. (*Id.* at p. 25).

Defendants submit an Urgent Care Medical Record dated August 12, 2005 indicating that Plaintiff presented with complaints of right knee pain. (DSOF, Exh. 12). Plaintiff reported to medical providers that she had been in an altercation[8], she felt her right knee "'pop' then pain, unable to bend." (*Id.*) The diagnosis was knee sprain and Plaintiff was prescribed Motrin, an ace wrap and crutches. (*Id.*).

In November 2006, Plaintiff was in another car accident and her right knee hit the dashboard causing pain. (PSOF, Exh. 4 at pp. 25-26). She was seen at a hospital emergency room and was told, after an x-ray, that "everything looked fine." (*Id.* at pp. 26-27). She was

---

[8]In a police report from that same date, August 12, 2005, Plaintiff's description of the altercation included that her boyfriend had "grabbed her shoulders..." and that she "twisted her right knee and fell to the ground." (DSOF, Exh. 11).

released without a brace, crutches or medication. (*Id.* at p. 27). She was able to walk out of the hospital. (*Id.*).

On April 27, 2007, Plaintiff did not see Defendant Salcido kick her before she went to the ground. (PSOF, Exh. 4, p. 117). She felt pressure applied to her leg, "heard a pop" and felt "a lot of pain." (*Id.* at pp. 117-118). After being handcuffed by Defendant Salcido, Plaintiff complained that her leg hurt and that she could not walk. (*Id.* at p. 95). Paramedics were called. (*Id.*). Plaintiff was taken to Kino Hospital. (PSOF, Exh. 4, p.97; DSOF, Exh. 10).

According to a May 4, 2007 Clinic Progress Note by Scott Justesen, M.D., of University of Physicians Healthcare (hereinafter "UPH") Arizona Institute for Sports Medicine, Plaintiff was informed by staff at Kino that x-rays "revealed a fracture along the lateral knee."[9] (DSOF, Exh. 10). She was placed in a knee immobilizer and "made nonweightbearing and sent to..." Dr. Justesen for evaluation. (*Id.*). Upon initial review of the x-rays, Dr. Justesen opined that "this may represent an old fracture....I explained to her that I was not discounting that there was an injury to the knee; however, I was evaluating that

---

[9]Dr. Justesen's record is admissible under the business records exception to the hearsay rule. Fed.R.Evid. 803(6). *See also United States v. Hall,* 419 F.3d 980 (9th Cir. 2005). Plaintiff's statements to Dr. Justesen concerning her injury were statements made for the purpose of medical diagnosis or treatment, and are also hearsay exceptions. *See* Fed.R.Evid. 803(4). Moreover, Defendants' medical expert, Dr. Hess, in preparing his report, reviewed Dr. Justesen's report and Dr. Justesen's report was discussed in Dr. Hess' February 16, 2009 report and at length at Dr. Hess' deposition. (*See* PSOF, Exh. 7 at pp. 10, 18-20, 40, 91-96; PSOF Exh. 8; *see also* PSOF, Exh. 7 at p. 3 (listing "UPH Clinic Progress Note, 5/4/07" as an exhibit at Dr. Hess' deposition)). Consideration of pertinent portions of Dr. Justesen's record serves to illuminate Dr. Hess' testimony discussed *infra*. *See In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 762 (3d Cir. 1994) ("[W]e think that evaluation of the patient's medical records, like performance of a physical examination, is a reliable method of concluding that a patient is ill even in the absence of a physical examination. It is hornbook law that medical records are admissible for such a purpose-'[a]s to hearsay symptoms told by third persons, ..., where the information is that of an *attending nurse or physician* having personal observation and an interest in learning and describing accurately, there seems to be every reason for admitting testimony based in part on this.' 3 John Henry Wigmore, *Wigmore on Evidence* § 688(4) (Chadbourn ed. 1970).").

this may not represent an acute fracture." (*Id.*). Plaintiff told Dr. Justesen that one and one-half to two years ago, she injured her right knee and there were torn ligaments. (*Id.*). She was not seen by an orthopedic surgeon nor did she have any follow up. (*Id.*). "She stated the knee got somewhat better...." (*Id.*). In reviewing the x-rays, Dr. Justesen saw evidence of "a small chip of bone along the lateral knee near the fibula. However, the non irregularity of the contours, i.e. smooth contour, to me represents this may be a possible old avulsion fracture[10] versus an ossicle. There is also an irregularity through the proximal tibia which appears to be old in nature. This may represent facile sear versus old previous injury." (*Id.*). On physical exam, Dr. Justesen noted that Plaintiff had limited mobility in that while she could achieve full extension, she could "only flex to approximately 20 degrees." (*Id.*) He stated that "Lachman was difficult[]. However, I do not feel an unstable Lachman and there does appear to be an end point....There is tenderness along the lateral joint line and lateral knee. However, once again, this was performed at 20 degrees of flexion." (*Id.*). Dr. Justesen's assessment was: "Right knee pain with possible internal derangement." (*Id.*).

On July 30, 2007, John J. Wild, M.D., of Tucson Orthopedic Institute Surgical Facility, noted that clinical examination, x-rays, and MRI "verified [Plaintiff]...had an A[nterior] C[ruciate] L[igament] tear with a probable locked medial meniscus."[11] (PSOF, Exh. 5). On July 30, 2007, Dr. Wild performed "[a]rthroscopic anterior cruciate ligament reconstruction utilizing patellar tendon, central third bone-tendon-bone, screw fixation with titanium screws...[and] [a]rthroscopic partial lateral meniscectomy." (*Id.*). Dr. Wild's report indicates that Plaintiff "was unfortunately involved in an altercation while she was working

---

[10]An avulsion fracture "occurs when a joint capsule, ligament, or muscle insertion of origin is pulled from the bone as a result of a sprain dislocation or strong contracture of the muscle against resistance; as the soft tissue is pulled away from the bone, a fragment or fragments of the bone may come away with it." *Stedman's Medical Dictionary,* 686 (1995 26th ed.).

[11]Like Dr. Justesen's report, Dr. Wild's record is admissible under the business records exception to the hearsay rule. Fed.R.Evid. 803(6).

at Tucson Community Center when she was kicked, had a significant blow."[12]  (*Id.*).

John A. Meaney, M.D., an orthopedic surgeon at Rincon Orthopedic Associates and Plaintiff's expert witness, examined Plaintiff on November 4, 2008.  (PSOF, Exh. 6).  In a a November 4, 2008 letter to Plaintiff's counsel, Dr. Meaney stated that he had:

> reviewed [Plaintiff's]...copious records and reviewed the police officer's description of how Stephanie was injured. The police officer said he broke her plane of balance, and in fact was trying to do that, and this is consistent with her injury.   The mechanism of injury to Stephanie's knee, to within a reasonable degree of probability, caused the tears in the ligaments and the cartilage in her knee.

(*Id.*).[13]

Defendant's expert witness, orthopedic surgeon James Hess, D.O., of Desert Valley Orthopedic Surgery, performed an independent medical examination of Plaintiff on February 16, 2009.  (PSOF, Exh. 7 at p.4; PSOF, Exh. 8).  According to Dr. Hess:

> [o]n 5-8-07, when she saw Dr. Andre McNulty, an E.R. doctor, it was noted that the x-ray was interpreted as an old fracture in the lateral aspect of the knee.  On 5-4-07 when she was seen by Dr. Justeson [sic] at the Arizona Institute for Sports Medicine there is mention in the history that she had a previous knee injury 18-24 months prior to the 4-27-07 [sic]. She was told that she had torn ligaments....The exam by Dr. Justeson [sic] at that time was not conclusive for an ACL injury. Previous x-rays from an outside facility showed an old avulsion fracture and his assessment was a chronic injury to the right knee.

(PSOF, Exh. 8 at p.1).

When Plaintiff met with Dr. Hess, she told him that she was not sure "if the officer kicked her or not....[S]he was wrestling with the officer.  She was placed up against a wall and then upon moving away from the wall she had a hand cuff on one hand, her other hand was up in the air, and she plant [sic] and twisted the right knee.  She felt a sudden pop and immediate pain in the right knee."  (*Id.* at p.2). Dr. Hess' "overall clinical impression is one of a torn ACL right knee accompanied by a tear in the lateral meniscus of the right knee."

---

[12]Neither Plaintiff nor Defendants discuss this account of Plaintiff's injury and/or whether Dr. Wild was perhaps mistaken.

[13]Dr. Meaney submitted an affidavit wherein he stated that he wrote the November 4, 2008 letter.  (*See* PSOF, Exh. 6).

(*Id.* at p. 3). In his February 16, 2009 report, Dr. Hess raised the question "when did the ACL tear occur?" (*Id.*). Although Dr. Hess thought Plaintiff's report of a previous injury to her right knee during the domestic altercation was important, he also noted that

> [Plaintiff] states that she eventually totally recovered from that injury. You would think if she had tore her ACL or had a significant tear in the lateral meniscus that she would have some ongoing symptoms....Based on the way she describes this injury and altercation with the police officer it is feasible that she could have torn her ACL and torn the lateral meniscus. ACL injuries are usually the result of either a plant/twist injury or a valgus type injury, where somebody hits the lateral side of the knee causing the knee to buckle inward. There appears to be some question about whether the officer actually hit the knee. She states that she does not remember the officer hitting the knee.

(*Id.*). Upon learning that Plaintiff testified at her deposition that Defendant Salcido "did actually kick the knee," Dr. Hess stated that this "would be significant enough to cause this injury." (*Id.*). Dr. Hess concluded "that the ACL tear and the lateral meniscal tear are directly related to the 4-27-07 injury." (*Id.*). Based on the records he had as of February 16, 2009 and Plaintiff's statements to him, it was his "opinion that the ACL tear and the lateral meniscal tear are directly related to the 4-27-07 injury." (*Id.*; *see also Id.* (Dr Hess stated that it is medically probable that a single blow or a kick to the lateral side of the knee could have caused the ACL injury. )). When Dr. Hess wrote his February 16, 2009 report, he had a June 2007 MRI but did not have access to x-rays taken in April of 2007. (*Id.*).

In a May 6, 2009 letter, Dr. Hess indicated that he had reviewed the April 28, 2007 x-rays and upon such review, "[w]ith all things considered, it is difficult on these x-rays of 4-28-07 to state that this Segond fracture is new or old." (PSOF, Exh. 8).

At his August 2009 deposition, Dr. Hess was asked:

> Q. [Plaintiff's counsel]    So based upon the information that you reviewed and your review of Ms. Clark, these records we talked about, it's probable, then, that the tear to her anterior cruciate ligament in her right knee occurred during the altercation of April 27, 2007?

(PSOF, Exh. 7, p.11). Dr. Hess answered: "Correct." (*Id.*). However, after hearing Defendant Salcido's description of the maneuver he used with Plaintiff, Dr. Hess testified that "falling backwards is not really a classic–depending on the position of her leg, I mean, it's not a classic position you would think somebody would blow out their ACL....Again, a

- 17 -

plant-twist is where you're mainly concerned about this." (*Id.* at pp. 16-18). When asked by Plaintiff's counsel "if a man stepped into a woman and put his leg behind her leg, pushed her off balance at a 45-degree angle, she fell back and then twisted her knee in the process, could that be a mechanism to cause an ACL tear in the knee?", Dr. Hess responded "Yes." (*Id.* at p.18). Dr. Hess also testified that a kick to the knee would cause an ACL and cartilage tear. (*Id.* at p.50).

As to an exact date of the ACL tear, Dr. Hess testified:

> You'd think if somebody had a significant tear in the ACL in 2005 that she would have probably had more trouble with it. Now, could she have had a partial tear and then this subsequently went on to a full thickness tear, the 2007 threw her over the edge? Possibly. But I don't know....[B]ased on the information put in front of me here, seems like the 2007 is the most reasonable time period that she sustained this.

(*Id.* at pp. 10-11).

Dr. Hess also testified that the acute bone contusion that the June 2007 MRI showed was not evidence that the injury to the knee occurred on April 27, 2007 because:

> you could just tell that there's bone swelling there, but you can't put a date on it. I mean, it's acute meaning that, yeah, I mean–but it can't–it can't date the ACL injury. You just know that when you see posterolateral bony edema, that's highly suspicious for anterior cruciate–you see that in the anterior cruciate ligament tears.

(*Id.* at pp. 38-39). In Dr. Hess' opinion, this type of condition could exist for a few months but not for years, therefore, the condition could not have lasted since the 2005 incident when Plaintiff injured her right knee. (*Id.* at pp. 39-40). However, Dr. Hess opined that if Plaintiff had an old ACL injury, a twist could result in "that bony edema." (*Id.* at p.40 ("She has an old ACL injury. Can you have a twist and get that bony edema from an old ACL tear? Sure.")). Dr. Hess also testified:

> [T]here's two years–a two year time period where-- as far as I'm aware, unless you can show me some other records, where she didn't see anybody. And you would think that if she blew out the ACL, a heavy person like that and young and active with a meniscal tear, she would have had–she would have had something that would have brought her back into some urgent care or some ER.

(*Id.* at p.93), after which came the following exchange between defense counsel and Dr. Hess:

- 18 -

| | | |
|---|---|---|
| Q. [defense counsel] | | But she's a sedentary person. |
| A. [Dr. Hess] | | Nonatheletic, yeah. |
| Q. | | She may have a joint that is stable with an ACL tear. |
| A. | | Yes. |
| Q. | | She may have a meniscus tear that's asymptomatic. She may have a shorter term period–she's taking 800 milligrams of ibuprofen for a period of time. |
| A. | | Yeah, but how long? Don't know. |
| Q. | | Don't know. |
| A. | | Don't know. |
| Q. | | She may have symptoms...that subside, and given her activity level–and I can't tell you what her activity level was–...she may be asymptomatic until a later event. That's within medical reality. |
| A. | | That–sure. I can't argue that. I cannot argue with that, okay? But what's put before me is, Doctor, when did this ACL tear?...I'm not sure....If you look at Justesen's notes, he seems to think that it's an old lateral Segond fracture. Well, it's possible. I mean, but it's–you just don't know. I mean, the new MRI, boy, you got some posterolateral episode. You know something is going on, and that's very consistent with an ACL tear. But, geez, is that–is that an aggravation of a pre-existing condition, or was it all new?....[S]ure you could have an ACL and not have a Segond fracture, but when you do see that, you pretty much know that ACL is out. |

(*Id.* at pp. 93-95).

### B. Whether the Court Should Entertain Plaintiff's AMPSJ

As set out *supra* at II., Plaintiff requests entry of partial summary judgment concerning two facts: the first involving whether Defendant Salcido followed TPD general operating procedure; and the second involving causation. (*See* Plaintiff's AMPSJ, pp. 1-3; Plaintiff's Reply, p. 7 ("Plaintiff does not seek a ruling that Officer Salcido was negligent or that he acted unreasonably. Plaintiff seeks a much narrower ruling that Officer Salcido did not follow the TPD policy that he should have not have used use [sic] a takedown technique that had not been taught to him in the SALETC police academy.")).

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[a] party claiming relief may move...for summary judgment on all or part of the claim." Fed.R.Civ.P.56(a). Rule 56(c) contemplates a motion seeking entry of judgment in favor of the moving party.

Whereas, Rule 56(d)(1), captioned "Case Not Fully Adjudicated on the Motion", provides:

> *Establishing Facts.* If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts--including items of damages or other relief--are not genuinely at issue. The facts so specified must be treated as established in the action.

Fed.R.Civ.P. 56(d)(1) (italics in original). "The purpose of Rule 56(d) is to limit the scope of the trial by removing 'sham issues from the case.'" *Meschino v. International Telephone and Telegraph Corp.,* 563 F.Supp. 1066, 1073 (S.D.N.Y. 1983) (*quoting* 10A Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* 457-59 (1983)) (denying relief where the material facts identified by the movant "will have to be introduced in some form or another at trial and are not contested, [thus,] a Rule 56(d) order establishing their existence would neither remove 'sham issues' nor 'limit the scope of the trial.' We think it will be less confusing for the jury if these facts are established at trial in the normal presentation of evidence by both sides."). "Rule 56(d) 'allows a court to salvage some of the effort involved in ruling on a failed motion for summary judgment by resolving issues of law and fact for which a trial would not be necessary.'" *Harris Technical Sales, Inc. v. Eagle Test Systems, Inc.,* 2008 WL 343260, at * 9 (D.Ariz. Feb. 5, 2008) (*quoting In re Hat,* 2007 WL 2580688, at *8 (Bankr.E.D. Cal. Sept. 4, 2007)). "'The procedure was intended to avoid a useless trial of facts and issues over which there was never really any controversy and which would tend to confuse and complicate a lawsuit.'" *Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 n.3 (9th Cir. 1981) (*quoting* 6 *Moore's Federal Practice,* ¶56-20.(3.-2) (2d ed. 1976)). The Advisory Committee Notes to Rule 56(d) are clear that the court has "open-ended discretion to decide whether it is practicable to determine what material facts are not genuinely at issue." Fed.R.Civ.P. 56(d)(1) advisory committee's cmt. (2007 Amd.); *see also Hillis v. Heineman,* 2009 WL 1357392, at *1 (D. Ariz. May 14, 2009).

Herein, Plaintiff does not seek summary judgment on an entire claim. Instead, she seeks "partial summary judgment" on two distinct issues: (1) whether Defendant Salcido violated TPD General Operating Procedures; and (2) causation of Plaintiff's ACL tear. (*See*

Plaintiff's AMPSJ). Plaintiff's AMPSJ falls under Rule 56(d).

The District Court for the District of Arizona has acknowledged that there is a split of authority whether a party can independently move under Rule 56(d) for partial summary judgment on parts of a claim instead of filing a motion for summary judgment of a whole claim:

> It is less clear though whether a court "may make a determination under...Rule [56(d)]... only after having been presented with a motion for full summary judgment, having considered it, and having determined that it cannot be granted[,]" or whether relief may be granted under that Rule where, as here, a party has "fil[ed] an independent motion seeking adjudication of a particular issue, rather than filing a motion for full summary judgment[.]" *See* [*Hat,* 2007 WL 2580688, at *8]. Indeed, "[t]here is a ... split of authority as to whether a party can independently move under Rule 56(d) for partial summary judgment on parts of claims." *Advanced Semiconductor Materials America, Inc. v. Applied Materials, Inc.*, 1995 WL 419747, at *2 (N.D.Cal. July 10, 1995) (citations omitted).

*Harris Technical Sales, Inc.,* 2008 WL at *9. The *Harris* court also noted that "'Ninth Circuit district courts have found independent requests for partial summary adjudication to be appropriate where the fact or issue to be adjudicated is potentially case dispositive.'" *Id.* (*quoting Hat,* 2007 WL 2580688 at *9). In deciding whether to permit an independent Rule 56(d) motion, district courts within the Ninth Circuit have also considered whether significant time needed for trial would be saved by early resolution of an issue, thus narrowing the issues to be litigated and conserving judicial resources. *Compare, Id.* at *10 (although issue was not potentially case dispositive, the court permitted independent Rule 56(d) motion because, among other things, "significant time needed for trial would be saved... by early resolution of this issue....") (internal quotations and citations omitted); *Advanced Semiconductor Materials, Amer., Inc.,* 1995 WL 419747 at *4 ("the purpose of summary judgment is met when the summary adjudication of preliminary issues...helps to focus the issues to be litigated, thus conserving judicial resources.");*Ajir v. Exxon Corp.,* 1995 WL 261411 (N.D. Cal. May 2, 1995) (same); *with Hillis,* 2009 WL 1357392 at *1 (Arizona district court refusing to entertain independent Rule 56(d) motion where movant failed to show that issue was "dispositive of any claim in the case...[or] that early resolution of this issue would save significant time in the litigation or advance settlement of the case.");

*Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, (N.D. Cal. 1978) (denying request for Rule 56(d) relief based on "isolated factual and legal issues..." because "'Rule 56(d) does not contemplate summary judgments on evidentiary matters en route to...'"entry of summary judgment on all or part of a claim and "'does not authorize the initiation of motions the sole object of which is to adjudicate issues of fact which are not dispositive of any claim or part thereof.'") (*quoting Moore's Federal Practice,* ¶56.20(3.-2) (2d ed. 1948)).

Plaintiff has also captioned her motion as one for partial summary judgment as opposed to partial summary *adjudication. See Harris,* 2008 WL 343260 at *10 (finding "problematic" independent Rule 56(d) motion wherein movant requests "partial summary *judgment* as opposed to partial summary *adjudication*.") (emphasis in original). The Ninth Circuit has observed that although "'[i]t is clear that Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim[,]...the term 'partial summary judgment' as applied to interlocutory summary adjudication is often a misnomer.'" *Lies,* 641 F.2d at 769 n.3 (*quoting* 6 *Moore's Federal Practice*, ¶56.20 (3.-2) (2d ed. 1976)). This is so because a "partial summary judgment" is interlocutory, involves adjudication of less than the entire action, and consequently does not purport to authorize a final appealable judgment. *Harris,* 2008 WL 343260 at *11 (citation omitted). Moreover, entry of "partial summary judgment" is subject to revision at any time before the entry of judgment on the adjudication of all the claims, rights, and liabilities of all the parties. (*Id.*) (citations omitted). The Arizona District Court has found that if a Rule 56(d) motion is granted, "the more soundly reasoned approach is to grant partial summary adjudication, not partial summary judgment. Proceeding in this way is consistent with the purpose of Rule 56(d) which is to "'help[] focus the issues to be litigated, thus conserving judicial resources." *Id.* (*quoting Advanced Semiconductor Materials Amer.,* 1995 WL 419747, at *4).

Plaintiff has not specifically argued that her AMPSJ is appropriate under Rule 56(d). The two issues she has identified in her AMPSJ are not case or claim dispositive. Nor does Plaintiff discuss how trial would be impacted by an established finding that Defendant Salcido failed to follow TPD general orders. With regard to constitutional claims of

excessive force under section 1983, the Ninth Circuit has recognized that:

> A Fourth Amendment claim of excessive force is analyzed under the framework set forth by the Supreme Court in *Graham v. Connor*, [490 U.S. 386, 109 S.Ct. 1865 (1989)]. That analysis requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. [*Id*. at 396, 109 S.Ct. 1865.] Determining whether a police officer's use of force was reasonable or excessive therefore "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force. *Id.; see Deorle v. Rutherford*, 272 F.3d 1272, 1279-81 (9th Cir.2001). Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. *See, e.g., Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10[ (9th Cir.1997)] (citing several cases). This is because police misconduct cases almost always turn on a jury's credibility determinations....*Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.2002).

*Drummond ex. rel Drummond v. City of Anaheim,* 343 F.3d 1052, 1056 (9th Cir. 2003); *see also Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010) (the Fourth amendment does not require that officers use the least amount of force necessary). The *Drummond* court pointed out that although training materials and police department guidelines may be considered when evaluating whether a particular use of force was reasonable, such materials and guidelines are not dispositive. *See Drummond*, 343 F.3d at 1059. Therefore, whether Defendant Salcido failed to comply with the TPD guideline is not dispositive of Plaintiff's section 1983 claim. Moreover, it is not clear how resolution of that issue would be dispositive of any part of that claim.

Nor has Plaintiff addressed how a ruling that Defendant Salcido failure to comply with TPD's guideline would be dispositive of any part of her state claims. Granting Plaintiff the benefit of the doubt, it is arguable that trial would be shortened by early resolution of this issue.

Likewise, early resolution of the issue of causation would save significant time needed for trial. Plaintiff's request for a finding regarding causation "'goes much further than seeking...an adjudication of an issue of fact which would not be dispositive of an issue or even part of an issue.'" *Harris,* 2008 WL 343260, at *10 (*quoting Hat,* 2007 WL 2580688,

at *9). Moreover, Plaintiff's resolution of the issue of causation will be dispositive of a part of all of Plaintiff's claims.

Although Plaintiff has not moved for full summary judgment, for the foregoing reasons, the Court will allow Plaintiff's independent motion seeking resolution of the issue of whether Defendant Salcido failed to comply with TPD guidelines and the issue of causation. *See Id.*

C.    Standard

The Rule 56(c) summary judgment standard applies to determinations of Rule 56(d) motions. *See Amdahl Corp. v. Profit Freight Sys., Inc.,* 65 F.3d 144, 146 (9th Cir. 1995); *Harris,* 2008 WL 343260, at *11-*12 A grant of a summary adjudication motion is reviewed de novo. *Kendall-Jackson Winery, Ltd. v. E&J Gallo Winery,* 150 F.3d 1042, 1046 (9th Cir. 1998) (*citing Amdahl Corp.,* 65 F.3d at 146).

Pursuant to the Federal Rules of Civil Procedure, a party may seek summary judgment where there is no genuine issue as to any material fact and that party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2). Summary judgment is appropriate only when the pleadings, discovery and disclosure materials on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.*

The initial burden rests on the moving party to point out the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Rule 56 places no evidentiary burden on the moving party beyond that which is required to prevail at trial. *Id.* The moving party need provide nothing more than a reference to those materials on file in the case that support the movant's belief that there is an absence of any genuine issue of material fact. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir. 1990). Once the moving party has satisfied this initial responsibility, the burden then shifts to the opponent to come forward with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986) (*quoting* Fed.R.Civ.P. 56(e) (emphasis omitted)). A genuine issue of material fact exists "if the evidence is such that a reasonable

jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *See also Celotex,* 477 U.S. at 324 (the opponent must demonstrate through production of probative evidence that an issue of fact remains to be tried.). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l. Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968). The opposing party may not rest on mere allegations or denials in its pleading but "must–by affidavits or as otherwise provided in...[R]ule [56]–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Nor may the opponent rely upon conclusory or speculative testimony to raise a genuine issue of fact to defeat summary judgment. *Anheuser-Busch, Inc. v. Natural Beverage Distrib.,* 69 F.3d 337, 345 (9th Cir. 1995). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Thomas v. Douglas,* 877 F.2d 1428, 1430 (9th Cir. 1989). *See also Celotex,* 477 U.S. at 322-23.

When resolving a motion for summary judgment, the "trial court can only consider admissible evidence...." *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir. 2002). Moreover, at the summary judgment stage, the trial court is not to make credibility determinations or weigh conflicting evidence; but the court is required to view all inferences in the light most favorable to the non-moving party. *Musick*, 913 F.2d at 1394. The ultimate question is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The mere existence of a scintilla of evidence supporting the non-movant's position will be insufficient; there must be evidence from which a fair-minded jury could reasonably find for the non-movant. *Anderson,* 477 U.S. at 252. If the factual context makes the non-movant's claim implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita,* 475 U.S. at 587.

D.     Analysis

1.     Compliance with Arizona's Notice of Claim Statute

In Arizona, persons who have claims against a public entity, or public employee, such as Defendants, must file a claim with the person designated to accept service of process for the entity within 180 days after the cause of action accrues.  Ariz. Rev. Stat. § 12-821.01(A). It is well established that state notice of claim statutes are preempted with respect to federal civil rights actions, such as Plaintiff's section 1983 claim. *Felder v. Casey*,  487 U.S. 131 (1988); *Tryon v. Avra Valley Fire District*, 659 F.Supp. 283, 284-85 (D.Ariz. 1986). However, Plaintiff's state claims remain subject to Arizona's notice of claim statute. *See Tyron,* 659 F.Supp. at 284.

Defendants argue that Plaintiff "never claimed, as required by ARS §12-821.01, that the arresting officer, Mr. Salcido[,] tripped her or used some 'takedown' in a negligent manner in violation of any standard or General Order of the Tucson Police Department." (Defendants' Response, p. 4).  Therefore, Defendants argue that any such claim is barred by ARS §12-821.01.  (*Id.*).

Defendants raise this issue after expiration of the dispositive motion deadline but proffer no reason to permit such an argument.  However, Plaintiff does not argue that Defendants' defense is untimely raised.  If the issue is one of subject matter jurisdiction, the objection may be raised at any time.  *See* Fed.R.Civ.P. 12(h)(3); *Intercontinental Travel Marketing, Inc. v. Federal Deposit Insur. Corp.,* 45 F.3d 1278, 1286 (9th Cir. 1994).  This District Court has noted, that "[t]he Arizona state courts' decisions on point have not been entirely consistent with regard to whether failure to comply with the statute deprives the court of jurisdiction over the claim." *Nored v. City of Tempe,* 614 F.Supp.2d 991, 994 n.3 (D.Ariz. June 26, 2008) (*citing cases*).  Defendants have provided no argument or authority to support the position that failure to comply with the notice of claim statute deprives this Court of subject matter jurisdiction over Plaintiff's state law claims.  However, even assuming arguendo that subject matter jurisdiction is at issue, Defendants still fail on the merits of their argument.

The notice of claim statute sets forth specific requirements for the content of the claim:

> The claim shall contain facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount.

ARS §12-821.01(A) (2003). Moreover, "[a]ny claim which is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon." *Id.*

It is undisputed that Plaintiff filed a Notice of Claim with the City of Tucson regarding the events of April 27, 2007.[14] (DSOF, Exh. 9).

Defendants take issue with Plaintiff's Notice to the extent that they claim that Plaintiff failed to allege that Defendant Salcido "tripped her or used some 'takedown' in a negligent manner in violation of any standard or General Order of..." TPD. (Defendants' Response, p. 4).

In her Notice of Claim, Plaintiff described the events of her encounter with Defendant Salcido. (DSOF, Exh. 9). In pertinent part, Plaintiff stated:

> [O]fficer [S]alcido pulled me from the wall and told me to stop yelling your [sic] going to jail I replied by calling my brothers [sic] name over and over I herd [sic] [O]fficer [S]alcido count to three and then he kicked me in my right knee with his left leg I felt a pop and feel [sic] down screaming after kicking me [O]fficer [S]alcido was on my back with both of his knees on the ground and he was still trying to retrieve my right arm at this point I had my right arm was smashed on my chest due to the officers [sic] [S]alcidos [sic] weight....
> ***
> I do plan to take action for the recklessness behavior and excessive force that was displayed by Officer Salcido....

(*Id.* at pp.1, 3). Defendants also assert that Plaintiff alleged in her Complaint that she was

---

[14]The date of Plaintiff's Notice is not evident from the exhibit submitted by Defendants at DSOF, Exh. 9. In their Response, Defendants state that Plaintiff filed the Notice of Claim on September 21, 2007. (Defendants' Response, p.2).

Plaintiff testified at her deposition that she prepared the Notice of Claim approximately six months after the incident. (PSOF, Exh. 4 at p. 47). She had notified "Preapid Legal" about the incident and "was told this is one of the steps that I needed to take." (*Id.* at p. 48). She typed the Notice herself. (*Id.*).

violently kicked by Defendant Salcido but "[n]ow Plaintiff claims it was a take down, not a kick, that Officer Salcido used and that said take down was wrong because his police academy training did not include that specific take down method." (Defendants' Response, p. 3). Defendants argue that Plaintiff cannot now "claim some sort of negligent takedown..." because "she never filed a notice of claim on that issue." (*Id.*). Nor has she amended her complaint on that issue. (*Id.*). Plaintiff counters that her Notice of Claim is adequate. (Plaintiff's Reply, p.3).

The notice requirements of ARS § 12-821.01 serve several important functions. They allow the public entity the opportunity to investigate the claim and assess its liability, permit the public entity the opportunity to attain a settlement and avoid costly litigation, assist the public entity in financial planning and budgeting, and provide a procedure by which the legislature will be advised of claims for which no payment has been provided. *Backus v. State of Arizona,* 220 Ariz. 101, 106, 203 P.3d 499, 504 (2009) (*en banc*); *Yollin v. City of Glendale,* 219 Ariz. 24, 28-29, 191 P.3d 1040, 1044-1045 (App. 2008)(citations omitted); *Vasquez v. State of Arizona,* 220 Ariz. 304, 206 P.3d 753 (App. 2008) (*citing Deer Valley Unified Sch. Dist. No. 97 v. Houser,* 214 Ariz. 293, 152 P.3d 490 (2007)); *Howland v. State of Arizona,* 169 Ariz. 293, 299, 818 P.2d 1169, 1175 (Ariz. App. 1991) (discussing former version of notice of claim statute). *See also Tyron,* 659 F.Supp. at 284. In light of these purposes, "the notice of claim anticipated by the statute must at least contain enough information to allow the state to intelligently ascertain these purposes so it can conscientiously allow or disallow the claim." *Howland,* 169 Ariz. at 299, 818 P.2d at 1175 (discussing former notice of claim statute). Therefore, in addition to a claim for a sum certain, "at a minimum,...the notice of claim must also contain 'an assertion of liability on behalf of the State in regard to a specifically described event sufficient to allow the State to investigate and determine its potential liability.'" *Id.* (*quoting State of Arizona v. Brooks,* 23 Ariz. App. 463, 466, 534 P.d 271, 274 (1975), *disagreed with on other grounds by Pritchard v. State of Arizona,* 163 Ariz. 427, 432, 788 P.2d 1178, 1183 (1990)). In construing a prior version of the notice of claim statute, the Arizona court found insufficient notice where the

plaintiff "gave no indication of any specifically described event, dates, or the nature of plaintiff's loss." *Howland,* 169 Ariz. at 299, 818 P.2d at 1175.

Plaintiff notified Defendants of the facts surrounding her encounter with Defendant Salcido including the facts that Defendant Salcido kicked her[15], her knee popped, and immediately thereafter she fell down to the ground where Defendant Salcido placed both his knees on Plaintiff's back and handcuffed both her hands. (DSOF, Exh. 9). Defendants attempt to draw a distinction between a claim that Plaintiff was kicked and fell to the ground and a claim that Defendant Salcido was using some kind of unauthorized take down technique when he allegedly used his leg in a manner that caused Plaintiff to fall to the ground. Regardless, whether Defendant Salcido's actions are characterized as a kick or a take down, Defendants received notice of the alleged facts of Defendant Salcido's actions on which Plaintiff bases her claim. Plaintiff does not advance a cause of action solely reliant on the issue whether Defendant Salcido's actions violated TPD general orders. That allegation and argument is merely a theory Plaintiff advances to establish her case which is based on the facts contained in her notice. Plaintiff provided adequate notice of the facts surrounding the incident and Defendant Salcido's actions, in particular, to satisfy A.R.S. § 12-821.01.sufficient for Defendants to understand the basis upon which liability is claimed and to assess their liability in light of Defendant Salcido's actions.

The analysis now turns to Plaintiff's arguments in support of her AMPSJ.

### 2. Whether Defendant Salcido violated TPD's General Order

Plaintiff argues that Defendant Salcido had not been trained to use a backward tripping technique and that TPD General Order 2043.1 forbids use of an empty hand control technique by an officer when that officer has not been trained in such a technique, "[e]xcept

---

[15]At her deposition, Plaintiff testified that she did *not* see Defendant Salcido kick her before she heard a pop, felt pain, and went to the ground. (PSOF, Exh. 4 at p.117-118). She testified that she wrote in her Notice of Claim that Defendant Salcido kicked her in her right knee. (*Id.* at pp. 82-83). When questioning her about her Notice of Claim, defense counsel asked "And then he deliberately kicked you in the right knee?" and Plaintiff answered "Yes." (*Id.* at p.83).

in cases of extreme emergency, in which there are no viable alternatives...." (PSOF, Exh. 9).

Thus, according to Plaintiff, Defendant Salcido "did not follow the Tucson Police Department's General Operating Procedures when he forced Plaintiff...from a standing position to a lying position on the ground when while facing her he used his hands to push her off balance and then placed one of his legs behind her right leg causing her to trip and fall backwards onto the ground." (Plaintiff's AMPSJ, pp. 1-2).

Defendants contend that Defendant Salcido did not violate TPD General Order 2043.1 and that he faced an extreme emergency in which there were no viable alternatives but to act as he did. (Defendant's Response, pp. 4-6). Defendants cite the following facts to support their argument: (1) Plaintiff refused to submit to a lawful arrest and physically resisted the arrest; (2) Plaintiff was yelling for her brother and others; and (3) Defendant Salcido was "in fact confronted by a group of people who came out of the apartments in response to Plaintiff's call for reinforcements which caused him to fear for his safety." (*Id.* at p. 6; *see also Id.* at p.2 (Defendant Salcido "forced [Plaintiff]...to the ground so he could handcuff her....He did so after a relatively protracted struggle with Plaintiff and while he had to ward off people from the apartment building including Plaintiff's (apparent) brother who threatened to intervene and caused Officer Salcido to fear for his safety.")).

Plaintiff counters that this was not a case of an extreme emergency given that Defendant Salcido had her pinned against the wall for 30 to 45 seconds[16], he had affixed a handcuff to her left wrist, had her left arm pinned behind her back, and he then pulled her away from the wall, pushed her backwards and tripped her so that she would fall backwards. (Plaintiff's Reply, pp. 5-6). Plaintiff also argues that Defendant Salcido was not "*at the same time* 'warding off' reinforcements..." in light of undisputed fact that Defendant Salcido did not see reenforcements until after he had Plaintiff under control on the ground. (Plaintiff's Reply, pp. 5-6 (*quoting* Defendants' Response, at p. 2)(emphasis in original)).

_____

[16]Plaintiff cites Ms. Carson's testimony to support her contention that Defendant Salcido had pushed Plaintiff up against the wall of the apartment building.

Officer Patterson testified that Defendant Salcido was not trained in the specific maneuver that he described using with Plaintiff. (PSOF, Exh. 2 at pp. 115, 117, 127-128). Officer Patterson also testified that during training, there is no way that an instructor can spell out every possible set of circumstances that the officers will encounter, "[s]o although we can give them some guidelines and some basic principles of what it is that they do...we can give them some techniques..., it would be impossible to say it would work every time under every condition under every set of circumstances." (PSOF, Exh. 2 at pp. 30-31). Therefore, instructors also teach officers that "[t]here comes a time when certain things happen in a confrontation and you may go outside the basic guidelines of what's written specifically on this piece of paper in order to successfully resolve the...circumstances of that confrontation." (*Id.*). For these situations, officers are taught "anything that works" but "[w]e still go under the principle that if you have to do something to get somebody under control, the big key is this: It has to be reasonable and it has to be based on the circumstances at the time of the event." (*Id.* at p.32).

Plaintiff argues that Defendant Salcido used an empty hand control technique, i.e., a takedown, which violated TPD General Order 2043.1 because Defendant Salcido was not trained in the use of that technique. Plaintiff also argues that the situation did not fall within the exception to that General Order because Defendant Salcido did not face a "case[] of extreme emergency, in which there [were] no viable alternatives...." (PSOF, Exh. 9).

Neither Plaintiff nor Defendants cite any TPD General Orders or other materials which define the term "extreme emergency" as used in General Order 2043.1. Nor do the parties cite deposition testimony or other evidence as to Defendant Salcido's opinion whether he had viable alternatives to the actions he took. Plaintiff argues here that Defendant Salcido could have kept her pinned against the wall until backup arrived. The parties have not cited any portion of the record wherein Defendant Salcido was asked why he did not pin Plaintiff to the wall until backup arrived.

The undisputed facts show that Defendant Salcido was familiar with the area where he encountered Plaintiff, which he described to be a "[h]igh crime rate area." (PSOF, Exh.

1 at p. 59; *see also Id.* at pp. 94-95). He had previously made arrests in that area and he was

2 familiar with the particular apartment complex where he encountered Plaintiff. (*Id.*). He

3 cited prostitution, drugs, gangs, and one homicide "involving a very violent suspect" as the

4 type of crime he associated with that apartment complex. (PSOF, Exh. 1, at p.59). Ms.

5 Carson, when testifying that she went outside to investigate when she heard a woman

6 screaming, stated that "[o]ur neighborhood has incidences that happen in it." (PSOF, Exh.

7 3, p.26).

8        It is not entirely clear on the record what time the encounter with Plaintiff occurred.

9 What is known is that it was dark enough to require headlights as Defendant Salcido testified

10 that his attention was drawn to Plaintiff's vehicle because she was driving with her headlights

11 off, and Plaintiff maintains she was driving with her headlights on. (PSOF, Exh. 1 at p.59;

12 Exh. 4 at p. 49).

13        It is also undisputed that from the first moment Defendant Salcido requested Plaintiff

14 to give him her license, Plaintiff did not comply and continued walking away from Defendant

15 Salcido. (PSOF, Exh. 1 at pp. 63-64, 68-69; PSOF, Exh. 4 at pp. 54-55). Although

16 Defendant Salcido was able to affix a handcuff to Plaintiff's left wrist, Plaintiff continued

17 to physically resist Defendant Salcido's efforts to handcuff her other hand and to stop

18 her–she flailed her arms and pulled away. (PSOF, Exh. 1 at pp. 70-71). Defendant Salcido

19 testified that when he initially grabbed Plaintiff's left arm, he "was attempting to place her

20 in the OCCS grip..." a technique which he had been trained to perform, but Plaintiff "pulled

21 away very violently and continued to resist, so,...it [*i.e.,* the OCCS grip] did not" work. (*Id.*

22 at p. 96). Plaintiff also continuously screamed and such screams included calling for help

23 and calling a man's name. (*Id.* at p. 91; PSOF, Exh. 3 at pp. 16, 19-21; PSOF, Exh. 4 at pp.

24 77-78). Although Defendant Salcido did not know at that time that the man's name Plaintiff

25 was screaming was her brother's name, he did believe she was calling for reinforcements and

26 he feared for his safety. (PSOF, Exh. 1 at pp. 73, 91, 94-95).

27        There is testimony from Plaintiff that at some point, after Defendant Salcido had

28 cuffed her left wrist, her thighs, stomach, chest and face were pressed against the wall of the

apartment complex and that she was against the wall for approximately 30 to 45 seconds. (PSOF, Exh. 4, pp. 83-84, 114-116). Ms. Carson also testified that Defendant Salcido used his body to hold Plaintiff against the wall "because she's fighting him the whole time and trying to get away from him." (PSOF, Exh. 3 at p.15; *see also* PSOF, Exh. 3 at p. 14 (Defendant Salcido had Plaintiff "up against the wall)). Although Defendant Salcido recalled that Plaintiff pulled away from him in the direction of the wall, he did not recall whether Plaintiff's body ever came into contact with the wall or whether she was ever pinned against the wall. (PSOF, Exh. 1 at p.89). Plaintiff and Ms. Carson agree that at some point, Plaintiff and Defendant Salcido came away from the wall and struggled out onto a graveled area. (PSOF, Exh. 4 at p. 82; PSOF, Exh. 3 at p. 17).

Although Defendant Salcido was taller than Plaintiff, Plaintiff outweighed him by at least 35 pounds if not more. (PSOF, Exh. 1 at p. 58 (on the incident date Defendant Salcido was approximately 29 years old, six-feet tall and weighed approximately 185 pounds; PSOF, Exh. 4 at p.113 (on the incident date, Plaintiff was five-feet-six to seven inches in height, and weighed between 220-235 pounds); DSOF, Exh. 10 (on the incident date Plaintiff was 25 years old); *see also* PSOF, Exh. 3 at p.18 (Ms. Carson testified that Plaintiff appeared to outweigh Defendant Salcido)). Although Plaintiff posits that Defendant Salcido could have kept Plaintiff pinned to the wall until backup assistance arrived, the record is not clear as to whether Defendant Salcido had sufficient control over Plaintiff during this time or that he could have held her in this position for the time it would take for backup to arrive. Taking Plaintiff's and Ms. Carson's testimony as true that Plaintiff at some point was pressed against the wall, factual questions still persist as to whether Defendant Salcido had control of Plaintiff sufficient to either subdue her or keep her in place to await the arrival of other officers.

Plaintiff also argues that Defendant Salcido was not faced with an extreme emergency. (*See* Reply, pp. 4-6). Plaintiff points to Defendant Salcido's testimony that reinforcements arrived when he had Plaintiff on the ground. (PSOF, Exh. 1 at p. 92). Ms. Carson testified that prior to Defendant Salcido taking Plaintiff to the ground, Plaintiff was pressed against

the wall and Plaintiff's "face was facing towards *the crowd*." (PSOF, Exh. 3 at p. 29) (emphasis added). Ms. Carson also testified that at some point after Defendant Salcido had Plaintiff on the ground, a man emerged from the "crowd of people standing on the sidewalk...[a]nd...advanced forward...[a]nd the police officer told him to get back, and the guy went back...There was no aggression from the-the crowd, but I think the police officer was fearful that there would be." (*Id.* at pp. 18-19).

Although Defendants cite Defendant Gallego's testimony to support their assertion that Defendant Salcido requested backup "ASAP" (DSSOF, ¶141 (*citing* DSSOF, Exh. 2, p.15)), Defendant Gallego's testimony does not support that assertion given his testimony that Defendant Salcido's call for backup did not include the code for "ASAP." (*See* DSSOF, Exh. 2 at pp. 15-16; *see also* discussion *supra,* at n.6). It is unclear when Defendant Salcido called for backup. From Defendant Gallego's testimony, it appears that this might have occurred when Defendant Salcido initially stopped Plaintiff at the apartment complex parking lot to approach Plaintiff about driving without headlights. (*See* DSSOF, Exh. 2 at p. 15 ("I heard [Defendant Salcido] pull a traffic stop and he said he had a 1084....")). Defendant Salcido testified that he has "it documented that [he called for backup]...when I had Ms. Clark in handcuffs." (PSOF, Exh. 1, at pp. 98-99). It is not clear whether this is the same call Defendant Gallego testified about. Defendant Gallego said he arrived when Defendant Salcido was "putting a handcuff on..." Plaintiff. (DSSOF, Exh. 2 at p.17). If Defendant Salcido is correct that he called for backup *after* he had Plaintiff on the ground and in cuffs, then the "emergency" situation might have dissipated given that he had Plaintiff under control at that point–in fact the question is whether an emergency existed necessitating the maneuver that took her to the ground. If she was already on the ground, then he might not have needed backup "ASAP." It is also unclear whether Defendant Salcido had the capability to call for backup when away from his car or whether he could make that call without use of his hands which were engaged in the struggle with Plaintiff.

It is not entirely clear on the record when the crowd formed or the exact moment Plaintiff's brother arrived on the scene. It is clear that, in a quickly moving time period,

Defendant Salcido was dealing with a subject who outweighed him, who did not heed his commands, who physically resisted his attempts to control her, and who continuously called for help in general and for one man in particular.[17] Defendant Salcido testified that he believed that Plaintiff was calling for reinforcements and this caused him to fear for his safety, especially given the reputation of the apartment complex for its association with gang members, at least one homicide, and other crimes. There is no showing that Defendant Salcido knew at what precise moment, if at all, the man whom Plaintiff was calling for would arrive, whether that man would be armed and/or be accompanied by others, and what that man would or would not do to aid Plaintiff. Moreover, the fact that Plaintiff's brother did in fact comply with the defendant officers' commands does not impact the analysis given that how he would behave was an unknown at the time Defendant Salcido took Plaintiff to the ground. The undisputed facts of record show that Defendant Salcido faced a volatile situation which, at any moment could be compounded by the arrival of others to aid the already physically-resistant Plaintiff. Drawing all reasonable inferences in Defendants' favor as the Court must on summary adjudication, the Court concludes that a fair-minded jury could reasonably determine that under such circumstances Defendant Salcido feared for his safety and that the encounter fell within the exception to TPD General Order 2043.1.

Officer Patterson testified that he did not consider Defendant Salcido's actions to have violated General Order 2043.1 (DSOF, Exh. 3 at pp. 34-36). Officer Patterson acknowledged that the steps Defendant Salcido employed in the maneuver used with Plaintiff was "not something that specifically was trained in that order" but Defendant Salcido's actions had "components of everything that...would fit directly with a manner in which he was trained..." (PSOF, Exh. 2, at p.127).

Officer Patterson also testified that "in a real world environment..." the steps taught at training are "like a model that you can utilize but you can't say it will work 100 percent of

----

[17]In Defendant Salcido's words, he "was already dealing with someone who did not have any respect for authority. I did not know whether or not the person she was calling would have any respect for authority." (PSOF, Exh. 1 at p. 95).

the time in every set of circumstances." (DSOF, Exh. 3 at pp. 35-36). According to Officer Patterson, given the circumstances, Defendant Salcido's "response of utilizing that takedown to overcome the resistance [was]...appropriate" and "consistent with the manner in which he was trained and what he's attempting to accomplish, which is to get this resisting subject on the ground and under control, especially in light of the other circumstances that he has coming into play." (*Id.* at p.36).

On the instant record, drawing all reasonable inferences in favor of Defendants as the non-movants, a genuine issue of material fact exists as to whether Defendant Salcido violated the TPD policy at issue. Consequently, Plaintiff's request for summary adjudication of this issue is denied.

### 3. Causation

Plaintiff alleges that Defendant Salcido's:

> wrongful actions...inflicted and caused Plaintiff... to experience painful bone fracture(s) and ligament tears and injury about her knee and upper leg, which will cause some permanent change and injury, and probably disability and occupational impairment. Plaintiff ...suffered a painful fracture of her leg and knee as a result of the beating from [Defendant] Salcido. Plaintiff...probably will be left with a chronic pain condition in the knee and leg which was fractured. Plaintiff...was required to have reconstruction surgery, with implantation of hardware into her leg, to repair the injuries caused by..." [Defendant] Salcido.

(Complaint, ¶27). In her AMPSJ, Plaintiff requests that the Court rule that:

> Defendant Officer Salcido's use of force on Plaintiff Stephanie Clark while facing her he used his hands to push her off balance and then placed one of his legs behind her right leg causing her to trip and fall backwards onto the ground caused Plaintiff Stephanie Clark to experience a tear to her anterior cruciate ligament in her right knee.

(Plaintiff's AMPSJ, p. 2).

In reversing a district court's grant of a Rule 56(d) motion on the issue of causation, the Ninth Circuit has observed:

> Causation is generally a question of fact for the jury, unless "the proof is insufficient to raise a reasonable inference that the act complained of was the proximate cause of the injury." *Leaf v. United States*, 588 F.2d 733, 736 (9 Cir. 1978) [*abrogated on other grounds by Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004)]. Since the sufficiency of proof test involves a legal determination by the court, proximate cause may be said to be a mixed question of law and fact, which is generally sufficient to preclude summary judgment.

*Lies,* 641 F.2d at 770.

The Arizona Supreme Court has stated that "as far as causation-in-fact is concerned, the general rule is that a defendant may be held liable if his conduct contributed to the result and if that result would not have occurred 'but for' defendant's conduct." *Onitveros v. Borak,* 136 Ariz. 500, 505, 557 P.2d 200, 205 (1983) (finding that question of cause before the court was a question of fact for the jury), *superseded on other grounds by A.R.S. §4-312.*

Arizona courts have "unvaryingly define[d]" proximate cause as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Robertson v. Sixpence Inns of Amer., Inc.,* 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990) (citations omitted). To prove proximate cause, the plaintiff is not required to establish that the defendant's breach of duty definitively caused the plaintiff's injury, "'simply that the negligence increased the risk of injury....'" *Ritchie v. Krasner,* 221 Ariz. 288, 297, 211 P.3d 1272, 1281 (App. 2009) (*quoting Thompson v. Sun City Comm. Hosp., Inc.,* 141 Ariz. 597, 607, 688 P.2d 605, 615 (1984)). Like the Ninth Circuit in *Lies,* the Arizona court has also observed that "[o]rdinarily, the question of proximate cause is a question of fact for the jury. Only when plaintiff's evidence does not establish a causal connection, leaving causation to the jury's speculation, or where reasonable persons could not differ on the inference derived from the evidence, may the court properly enter a directed verdict [for defendant]." *Robertson,* 163 Ariz. at 546, 789 P.2d at 1047 (citations omitted). *See also Ritchie,* 221 Ariz. at 297, 211 P.3d at 1281 (*quoting Thompson,* 141 Ariz. at 507, 688 P.2d at 615) ("'The step from increased risk to [the probability of] causation is one for the jury to make.'").

Generally, where expert testimony bears on the issue of causation, "causation must be shown to be Probable and not merely Possible..." and testimony that some other event "'could' or 'may' have been the cause of the injury is insufficient." *Kreisman v. Thomas,* 12 Ariz. App. 215, 218, 469 P.2d 107, 110 (1970). However, Arizona courts have relaxed this "general rule concerning expert medical testimony and have sustained verdicts based upon expert testimony as to the Possible cause, when there is sufficient additional evidence

- 37 -

indicating the specific causal relationship." *Id.* (citations omitted). This exception to the general rule has been articulated as follows:

> To establish the causal connection between an accident and injury, a Sine qua non of liability, medical testimony as to the Possibility of such causal connection, without more, is insufficient. But if there is medical evidence of the possibility of the existence of the causal relationship together with other evidence or circumstances indicating such relationship, the finding that the accident caused the injury will be sustained.

*Kreisman,* 12 Ariz. App. At 110, 469 P.2d at 110 (*quoting Coca-Cola Bottling Co. v. Fitzgerald,* 3 Ariz. App. 303, 306 413 P.2d 869, 872 (1966)). Moreover,

> [e]xpert testimony,...is not conclusive upon the trier of fact, even though unimpeached and uncontradicted, since the trier may apply his own experience or knowledge in determining how far to follow the expressed opinion. However, this is subject to the general rule that the trier may not act arbitrarily in disregarding uncontradicted and entirely probable testimony of witnesses whose qualifications and judgment have not been discredited.

*Security-First Nat'l. Bank of Los Angeles v. Lutz,* 322 F.2d 348, 355 (9th Cir. 1963).

Plaintiff cites to a case on appeal from an Industrial Commission decision for the premise that "[w]here causation is peculiarly within the knowledge of medical experts as in heart attack cases, we must rely upon the opinion of medical experts to determine when an accident has occurred and its cause." *McNeely v. The Industrial Commission of Ariz.,* 108 Ariz. 453, 455, 501 P.2d 555, 557 (1972). Because Plaintiff has the burden of proof on this issue at trial, she must show that no reasonable trier of fact could find for Defendants. *See Calderone v. United States,* 799 F. 2d 254, 269 (6th Cir. 1986); *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir. 1991); *Ekloff v. Rodgers,* 443 F.Supp.2d 1173, 1176 (D. Ariz. 2006). Plaintiff asserts that her "treating and independent examining doctors along with the Defendants' own examining independent orthopedic specialist..., Dr. Hess, hold the opinion that the Plaintiff did not have a pre-existing ligament tear and that her ligament tear was caused by the altercation with Officer Salcido." (Plaintiff's Reply, p.8 (*citing* PSOF, ¶105-112 (which relates to testimony from Doctors Meaney[18] and Hess)). Dr.

---

[18]At oral argument, Plaintiff's counsel stated Dr. Meaney has examined Plaintiff and has treated her to the extent that he prescribed medication for her.

Meaney is of the opinion that based upon his examination of Plaintiff, review of medical records and Defendant Salcido's description of the maneuver used to take Plaintiff to the ground, "[t]he mechanism of injury to Stephanie's knee, to within a reasonable degree of probability, caused the tears in the ligaments and the cartilage in her knee." (PSOF, Exh. 6). Dr. Meaney's opinion pertinent to this issue is stated in two sentences. (*See Id.*). He provides no specific facts to support his opinion. "[I]n the context of a motion for summary judgment, an expert must back up his opinion with specific facts." *United States v. Various Slot Machines on Guam,* 658 F.2d 697, 700 (9th Cir. 1981).

Defendants' expert, Dr. Hess, testified at the outset of his deposition that it was probable the tear to Plaintiff's ACL occurred during the April 27, 2007 incident with Defendant Salcido. (PSOF, Exh. 8 at p.1). However, Defendants assert that Plaintiff's prior knee injury which occurred sometime between 2003 and 2005 is the cause of her ACL tear. Defendants argue that: "Plaintiff fails to present evidence that there is a possibility that the injury was a pre-existing condition." (Defendants' Response, p.6). It is unclear why Plaintiff would bear the burden of "present[ing] evidence..." that she had a pre-existing condition.

Defendants further argue that "Dr. Hess is not sure that the April 27, 2007 incident caused the ACL tear and Dr. Justesen thought it was an old injury." (*Id.* (*citing* DSOF, ¶¶126-132)). Defendants, as the non-moving parties, need not establish a material issue of fact conclusively in their favor. *First Nat'l. Bank of Ariz.,* 391 U.S. at 288-89. Instead, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 289.

Plaintiff testified that sometime in 2003 or 2004, she experienced a right knee injury due to a domestic violence altercation and was told by medical providers that she had torn ligaments. (PSOF, Exh. 4 at pp. 21-23). After a week or two using a brace and crutches and pain medication, she was back to full mobility. (*Id.*). A 2005 medical record and police report support the conclusion that the knee injury caused by the domestic violence event

about which Plaintiff testified occurred in 2005. (DSOF, Exh. 11, 12). In 2005, Plaintiff was diagnosed with knee strain, was given Motrin, and was released with crutches and an ace wrap. (DSOF, Exh. 12). Plaintiff also testified that in November 2006 she went to an emergency room after striking the dashboard with her right knee during a car accident. (PSOF, Exh. 4 at pp.25-26). She was told that "everything looked fine" and was released. (*Id.* at pp.26-27). There is no evidence that Plaintiff sought or received medical treatment for her right knee during the intervening period from the 2006 event to the April 2007 event. There is no medical record or opinion offered into evidence reflecting the exact date when Plaintiff's ACL tear was diagnosed after the April 2007 incident. In May 2007, less than one month after the incident between Plaintiff and Defendant Salcido, Dr. Justesen's review of Plaintiff's x-rays caused him to question "whether this may represent an old fracture." (DSOF, Exh. 10 ("the non irregularity of the contours, i.e. smooth contour, to me represents this may be a possible old avulsion fracture....")). Dr. Justesen was able to perform the Lachman test and did not feel an unstable Lachman, although the test was "difficult[]." (*Id.*). Yet, Dr. Justesen noted that Plaintiff did not have full mobility and his diagnosis included "possible internal derangement." (*Id.*)

Dr. Hess, in addition to being unable to provide an exact date when Plaintiff was injured (PSOF, Exh. 7, at p.10 ), also opined that it is within medical reality for Plaintiff to have had a meniscus tear that was asymptomatic until a later event. (*Id.* at p.94).

Turning to the actual incident between Plaintiff and Defendant Salcido, Plaintiff testified that Defendant Salcido kicked her in the right knee which caused her to hear a pop and to fall to the ground screaming with intense pain. (PSOF, Exh. 4 at pp. 82-84, 117-118). Dr. Hess testified that a kick to the knee would cause an ACL tear. (PSOF, Exh. 7, at p.50). However, Defendant Salcido's description of the maneuver did not include kicking Plaintiff in the right knee (PSOF, Exh. 1 at pp. 82-84; *see also* PSOF, Exh. 7 at pp. 16-17 (*quoting* PSOF, Exh. 1 at pp. 82-84)), Defendant Salcido denied kicking Plaintiff (PSOF, Exh. 1 at pp. 97-98), and Plaintiff testified that she did not see Defendant Salcido kick her. (PSOF, Exh. 4 at pp. 117-118). Moreover, witness Carson's description of the maneuver she

observed Defendant Salcido employ to take Plaintiff to the ground is consistent with Defendant Salcido's account. (PSOF, Exh. 3 at pp. 17-18). Despite Dr. Hess' opinion that a kick would have probably caused Plaintiff's ACL tear, there is a dispute of fact as to whether Defendant Salcido kicked Plaintiff as she claims.

Upon consideration of Defendant Salcido's description of the maneuver he employed with Plaintiff, Dr. Meaney, without explanation, reached the conclusion that "the tears in the ligaments and the cartilage in..." Plaintiff's knee were caused by same. (PSOF, Exh. 6). However, after hearing Defendant Salcido's description of the maneuver used with Plaintiff, Dr. Hess testified "falling backwards is not a really classic...position you would think somebody would blow out their ACL...." (PSOF, Exh. 7 at pp. 16-17). Instead, Dr. Hess opined that "usually it's a plant-twist kind of injury that you get it...or you get hit from the side...." (*Id.* at p. 17; *see also Id.* at p. 18 (a "plant-twist is where you're mainly concerned about..." an ACL tear.)). According to Dr. Hess, "there seems to be some discrepancy here on exactly where the leg is and where it was and falling backwards. And so, you know, it's not clear-cut as I see it." (*Id.* at p.18). When asked: "if a man stepped into a woman and put his leg behind her leg, pushed her off balance at a 45-degree angle, she fell back and then twisted her knee in the process, could that be a mechanism to cause an ACL tear in the knee?", Dr. Hess responded, "Yes." (*Id.* at p.18). In sum, examination of the record reflects that in contrast to Dr. Meaney, Dr. Hess, upon hearing Defendant Salcido's description of the maneuver opined that "falling backwards is not really a classic–depending on the position of her leg, I mean, it's not a classic position you would think somebody would blow out their ACL." (*Id.* at p. 17).

Precisely how Plaintiff came to the ground and the position(s) of her right leg during that time is in dispute. Under these circumstances, the question of causation must be addressed within the larger context of the physical movements involved in Plaintiff coming to the ground which remain in dispute. In drawing all reasonable inferences in favor of Defendants, the Court finds that genuine issues of material fact exist to preclude summary adjudication of the issue of causation.

# III.    DEFENDANTS' MOTION TO STRIKE A PORTION OF PLAINTIFF'S REPLY

Defendants have not disputed certain facts stated in Plaintiff's Statement of Facts filed in support of her AMPSJ.  In her Reply to Defendants' Response to her AMPSJ, Plaintiff requests that some, but not all, of those facts which Defendants did not controvert should be "deemed proven facts of the case." (Reply, p. 2).  Defendants object to this request and move to strike the request from Plaintiff's Reply.  (Defendants' Motion to Strike).  Defendants point out that the Rules  of Practice of the U.S. District Court for the District of Arizona provide that facts "'set forth in the moving party's separate statement of facts shall, unless otherwise ordered, *be deemed admitted for purposes of the motion for summary judgment* if not specifically controverted...in the opposing party's separate statement of facts.'"  (*Id.* at p.2 (*quoting* LR Civ 56.1(b)) (italics and underline in original).  Plaintiff argues that Fed.R.Civ.P. 56(d) allows for her request.

The facts that Plaintiff requests to have established for purposes of trial include a wide range of information.  The information concerns primarily:  background information about Defendant Salcido (his age, health condition, training) and portions of his deposition concerning his encounter with Plaintiff; background information about Officer Patterson (his training and experience, that he trained Defendant Salcido) and his testimony concerning TPD General Orders 2043.1 and 2043.2; a description of the kind of car Plaintiff drove; how Defendant Salcido described Plaintiff  physically; select portions of Plaintiff's description of her encounter with Defendant Salcido; the majority of Ms. Carson's testimony regarding her eye-witness account of the encounter; Dr. Meaney's background and opinion concerning causation; and select facts from Dr. Hess' report and testimony.  (*See* Plaintiff's Reply pp. 1-2 (*citing* PSOF, ¶¶ 1-8, 10-19, 35-36, 42, 56, 58, 61, 67-83, 85-92, 94-97, 99-111 (Plaintiff characterizes these facts as based largely on testimony from Defendant Salcido); PSOF ¶¶ 20 and 21 (Plaintiff characterizes these paragraphs as "simply re-stat[ing] one of the police policies on use of force"); PSOF ¶¶ 22-32 (Plaintiff characterizing these paragraphs as showing that Defendant Salcido was not trained in using a "backwards push and tripping

technique as a takedown....").

Plaintiff never cited Rule 56(d) in her AMPSJ. Moreover, in her AMPSJ, Plaintiff specified only two issues for resolution in her motion: Defendant Salcido's alleged lack of compliance with the TPD General Order and causation of the ACL tear. Instead, Plaintiff waited until her Reply to request summary adjudication of additional facts.

The standard for a Rule 56(d) motion is set out *supra at* II.B. Plaintiff has not argued how or why the additional facts identified in her Reply are dispositive of any claim or part thereof, how they would narrow the issues for trial, or how they would remove "sham issues". *See Meschino,* 563 F.Supp. at 1073 (denying Rule 56(d) request where movant did not show granting 56(d) relief would remove sham issues or limit the scope of the trial). Nor has she shown that an order deeming such facts as established would save significant time in the litigation or advance settlement of the case. *See Hillis,* 2009 WL 1357392 at * 1 (denying request for rule 56(d) relief where movant failed to show that the issue was "dispositive of any claim in the case" or that "early resolution of this issue would save significant time in the litigation or advance settlement of the case."). While it is true that most, if not all of these facts will have to be introduced in some form at trial, "it will be less confusing for the jury if these facts are established at trial in the normal presentation of evidence by both sides." *Meschino,* 563 F.Supp. at 1073. Defendants' Motion to Strike a Portion of Plaintiff's Reply is granted.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that genuine issues of material fact exist to preclude summary adjudication of the two factual areas identified by Plaintiff in her AMPSJ. The Court further finds that the additional facts upon which Plaintiff requests summary adjudication in her Reply brief do not merit summary adjudication at this time.

Accordingly, IT IS ORDERED that:

(1)     Plaintiff's Amended Motion for Partial Summary Judgment (Doc. No. 91), which the Court construes as a motion for summary adjudication, is DENIED;

(2)     Defendants' Motion to Strike a Portion of Plaintiff's Reply (Doc. No. 102) is

1  GRANTED and Plaintiff's request to establish facts additional to the two

2  identified in her Motion is stricken;

3  (3)  the parties shall have until **June 11, 2010** to lodge the Joint Proposed Final

4  Pretrial Order.  The content of the Joint Proposed Final Pretrial Order shall

5  include, but not be limited to, that prescribed in the form of Joint Proposed

6  Final Pretrial Order attached hereto.  Statements made shall not be in the form

7  of a question, but should be a concise narrative statement of each party's

8  contention as to each uncontested and contested issue; and

9  (4)  the Pretrial Conference is SET for **Thursday, July 15, 2010 at 9:00 a.m.**.

10  Following the Pretrial Conference, the Court will set the trial date and will

11  enter the Final Pretrial Order, incorporating the Joint Proposed Final Pretrial

12  Order and any additional instructions for trial preparation.

13  DATED this 5th day of May, 2010.

15  _____

16  Héctor C. Estrada
United States Magistrate Judge

- 44 -

```
 1
 2
 3                    IN THE UNITED STATES DISTRICT COURT
 4                      FOR THE DISTRICT OF ARIZONA
 5
 6              ,                    )
                                     )
 7              Plaintiff,           )
                                     )   No. CIV        -TUC-HCE
 8   vs.                             )
                                     )   JOINT PROPOSED FINAL PRETRIAL
 9              ,                    )   ORDER
                                     )
10              Defendant.           )
   _____  )
11
12          Pursuant to the Scheduling Order entered _____, following is the
13   Joint Proposed Final Pretrial Order to be considered at the pretrial conference.
14   A.    COUNSEL FOR THE PARTIES
15          Plaintiff(s):
16          Defendant(s):
17   B.    STATEMENT OF JURISDICTION
18          Cite the statute(s) that gives the Court jurisdiction, and whether jurisdiction is
19          disputed.
20          (E.g.: Jurisdiction in this case is based on diversity of citizenship under Title 28
21          U.S.C. § 1332. Jurisdiction is (not) disputed.)
22   C.    NATURE OF ACTION
23          Provide a concise statement of the type of case, the cause of the action, and the
24          relief sought.
25          (E.g.: This is a products liability case wherein the plaintiff seeks damages for
26          personal injuries sustained when he fell from the driver's seat of a forklift. The
27          plaintiff contends that the forklift was defectively designed and manufactured by
28          the defendant and that the defects were a producing cause of his injuries and
```

1    damages.)

2 **D.    CONTENTIONS OF THE PARTIES**

3    With respect to each count of the complaint, counterclaim or cross-claim, and to

4    any defense, affirmative defense, or the rebuttal of a presumption where the burden

5    of proof has shifted, the party having the burden of proof shall list the elements or

6    standards that must be proved in order for the party to prevail on that claim or

7    defense.

8    (E.g.:  In order to prevail on this products liability case, the plaintiff must prove the

9    following elements . . . )

10    (E.g.:  In order to defeat this products liability claim based on the statute of repose,

11    the defendant must prove the following elements . . . )

12 **E.    STIPULATIONS AND UNCONTESTED FACTS**

13 **F.    CONTESTED ISSUES OF FACT AND LAW**

14 **G.    LISTS OF WITNESSES**

15    A jointly prepared list of witnesses, identifying each as either plaintiff's or

16    defendant's and indicating whether a fact or expert witness, must accompany this

17    proposed order.

18    A brief statement as to the testimony of each expert witness must be included.

19 **H.    LIST OF EXHIBITS**

20    Each party must submit with this proposed order a list of numbered exhibits, with a

21    description of each containing sufficient information to identify the exhibit, and

22    indicating whether an objection to its admission is anticipated.

23    Exhibits should be marked according to instructions received from the court.

24 **I.    MOTIONS IN LIMINE**

25    Motions in limine shall be filed and served upon each party with this proposed

26    order.  Any opposition shall be filed and served within fourteen (14) days.

27 **J.    LIST OF ANY PENDING MOTIONS**

28 **K.    PROBABLE LENGTH OF TRIAL**

**L.** **FOR A BENCH TRIAL**

Proposed findings of fact and conclusions of law shall be served and filed on each

party with this proposed order.

**M.** **FOR A JURY TRIAL**

Stipulated jury instructions shall be filed thirty (30) days before trial.  Instructions

which are not agreed upon, and a concise argument in support of the instruction,

shall be filed and served upon each party thirty (30) days before trial.  Objections

to the non-agreed upon instructions shall be filed and served upon each party

within fourteen (14) days.

**N.** **CERTIFICATION**

The undersigned counsel for each of the parties in this action do hereby certify and

acknowledge the following:

1.    All discovery has been completed.

2.    The identity of each witness has been disclosed to opposing counsel.

3.    Each exhibit listed herein:  (a) is in existence; (b) is numbered, and: (c) has

been disclosed and shown to opposing counsel.

**O.** **ADOPTION**

The Court may adopt this Joint Proposed Pretrial Order as the Joint Final Pretrial

Order.

DATED: _____

APPROVED AS TO FORM AND CONTENT

_____          _____
Attorney for Plaintiff                                      Attorney for Defendant